UNITED STATES of America, Plaintiff-Appellee,

v.

Quema HOLLOWAY, Defendant-Appellant.

No. 83–1490.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 18, 1984.

Decided Aug. 2, 1984.

Certiorari Denied Nov. 13, 1984.
See 105 S.Ct. 440.

Kenneth T. Saukas (argued), Grand Rapids, Mich., for defendant-appellant.

John A. Smietanka, U.S. Atty., Jeanine Nemesi LaVille (argued), Grand Rapids, Mich., for plaintiff-appellee.

Before ENGEL, MARTIN and CONTIE, Circuit Judges.

CONTIE, Circuit Judge.

In this appeal we address for the second time the conviction of Quema Holloway for making a false, fictitious or fraudulent claim upon the United States government, in violation of 18 U.S.C. § 287.[1] The necessary factual background of this case is provided by our earlier decision. *See United States v. Holloway*, 731 F.2d 378 (6th Cir.1984). For the purposes of the present opinion we need note only the following facts. Holloway was charged with participating in a scheme in which certain prison inmates filed false tax returns. Holloway's participation in this scheme consisted of cashing the refund checks generated by these false returns. At trial, the government sought to introduce evidence of out of court statements made by Holloway's alleged coconspirator, Mickey Scarborough. Holloway objected to this evidence as being hearsay. The government responded to this objection by arguing that the evidence

would be admissible under the coconspirator exception to the hearsay rule. *See* Fed. R.Evid. 801(d)(2)(E). Although the trial court noted the objection, it failed to make the preliminary finding necessary for admissibility under *United States v. Enright*, 579 F.2d 980 (6th Cir.1978). We therefore remanded the case "to the district court to make the appropriate *Enright* finding." *Holloway*, 731 F.2d at 382. We also retained jurisdiction in order to "review the trial judge's *Enright* finding as well as defendant Holloway's other assignments of error." *Id.*

### I.

In *United States v. Enright*, 579 F.2d 980 (6th Cir.1978), we held that in order to use the coconspirator exception to the hearsay rule the government must prove by a preponderance of the evidence that a conspiracy existed, that the defendant against whom the evidence is offered was a member of the conspiracy, and that the hearsay statement was made in the course and in furtherance of the conspiracy. *See id.* at 986. *See also Holloway*, 731 F.2d at 381.

The testimony in question was given by Charles Daniel, a member of the scheme and a government witness. He testified as to several statements made by an alleged coconspirator, Mickey Scarborough, which implicated Quema Holloway in the scheme. Following this court's remand, the district court reviewed the record and found that the government had proved the threshold requirements for admitting a coconspirator's out of court statements by a preponderance of the evidence. We find no error in this ruling.[2]

---

**1.** 18 U.S.C. § 287 provides:

Whoever makes or presents to any person or officer in the civil, military, or naval service of the United States, or to any department or agency thereof, any claim upon or against the United States, or any department or agency thereof, knowing such claim to be false, fictitious, or fraudulent, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

The first Count of the two Count indictment charged that on or about May 17, 1980 Eddy Connor and Quema Holloway,

did wilfully cause to be made and presented to a department and agency of the United

States, to wit: the Department of the Treasury, a claim upon and against the United States and said department and agency, to wit: a tax refund check in the amount of ONE THOUSAND NINE HUNDRED FIFTY-THREE and 76/100 ($1,953.76) DOLLARS, knowing such claim to be false, fictitious and fraudulent.

The second Count charged Quema Holloway alone with a similar offense occurring in April 1981. Holloway was convicted under both Counts.

**2.** We reject at the outset Holloway's assertion that the district court committed error on remand by considering evidence which the

The finding that there was a conspiracy and that Holloway was a member of it is well supported. The record indicates that the conspiracy existed at least as long ago as early 1980, when Holloway cashed an income tax refund check for Eddy Connor, one of the inmates involved in the scheme. A letter from Connor to Holloway told Holloway how to distribute the proceeds from Connor's check as well as from the checks of two other inmates. Two parts of this letter are highly significant. First, one of the checks was from "Mickey." Second, Holloway was to retain part of the proceeds of the checks for herself. This letter thus supports a finding not only that there was a conspiracy, but that Holloway and Mickey Scarborough were members of it.

Also supporting this finding is the testimony of Holloway's ex-husband, Robert Holloway. Robert Holloway testified that Quema Holloway offered to help him obtain money by means of a tax fraud scheme. Robert Holloway also testified that Quema Holloway stated that before implementing this plan, she would need to contact Mickey Scarborough.

Finally, the court's finding is supported by the testimony of Charles Daniel, one of the inmates who participated in the scheme. Daniel testified that he was asked by a fellow inmate in 1980 and 1981 if he wanted to join the scheme. He agreed to do so in 1981 and was told that he would need an address "in the free world" to which the check could be sent. Lacking such an address, Daniel approach Scarborough. According to Daniel, Scarborough gave Daniel an address and told him that he could send his check there to be cashed. Daniel recalled that the address was in Blanchard, Michigan, where Quema Holloway resided. Scarborough told Daniel that this person was named Quema Holloway and that she had performed similar services in the past for him and in particular that she had cashed a check in 1980 for Scarborough as a part of the same scheme. Scarborough also told Daniel that he would have to pay Quema Holloway for her help.

The foregoing evidence provides ample support for the district court's finding that a conspiracy existed and that Quema Holloway was a member of it.

The finding that Scarborough's statements to Daniel, described above, were in the course and furtherance of the conspiracy is also well supported. Each of the statements explained how the scheme worked. They were thus used to recruit Daniel into the conspiracy and to give him information necessary to achieve its ends. We find no error in the district court's ruling that the statements were made in the course and in the furtherance of the conspiracy.

We now proceed to review Holloway's other assignments of error.

government had presented after she objected to the hearsay statement. Holloway argues that the district court, in essence, evaluated the hearsay evidence's admissibility under the third procedure sanctioned by *United States v. Vinson*, 606 F.2d 149 (6th Cir.1979), *cert. denied*, 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980). She argues that this was improper because the trial judge failed to comply with *Vinson's* requirement that at the time the hearsay evidence is conditionally admitted he advise counsel of the conditional nature of his ruling. Since the trial judge made no such admonition in this case, Holloway argues, her counsel did not have notice that the admissibility of the hearsay evidence was still open to dispute.

We find this argument unavailing for two reasons. First, the trial judge did not state that Holloway's objection was overruled, but merely stated that the government "may proceed." Given that *Vinson* is so firmly entrenched in this circuit's practice, we doubt that Holloway's counsel did not know that the judge intended to admit the evidence only on the condition that the government later establish the *Enright* foundation by a preponderance of the evidence. Second, the evidence which the trial judge used to find that the *Enright* foundation had been established was also highly probative of Holloway's knowledge that the checks had been fraudulently obtained. Holloway's sole defense was that she lacked this knowledge. Her counsel, therefore, had ample motivation to vigorously contest this evidence regardless of how the trial judge disposed of the hearsay objection. We thus find, on the somewhat peculiar facts of this case, that the trial judge's failure to advise counsel that the hearsay evidence was only conditionally admitted did not prejudice Holloway.

## II.

Holloway challenges two evidentiary rulings by the district court. The first relates to the admission of testimony concerning prior similar acts by Holloway. The second relates to the admissibility of character evidence.

■ The district court allowed the government to introduce evidence that Quema Holloway had cashed fraudulently generated income tax refund checks other than those charged in the indictment. The government contends that this evidence was admissible under Federal Rule of Evidence 404(b), as probative of intent or absence of mistake.[3] Holloway argues that these prior incidents were not admissible for any of the purposes specified in Rule 404(b) and that, even if they were, they should have been excluded under Rule 403 because their prejudicial impact outweighed their probative value.[4]

Holloway does not contend that she did not cash the checks specified in the indictment. Rather, her defense has been that she did not act with the requisite knowledge that the checks were fraudulently obtained. The issue of Holloway's knowledge was therefore central to the case. This court has on several occasions upheld the introduction of testimony of prior similar acts under Rule 404(b) as probative of the absence of mistake or presence of knowledge. *See, e.g., United States v. Grimes,*

620 F.2d 587, 588 (6th Cir.1980); *United States v. Tarnowski,* 583 F.2d 903, 906 (6th Cir.1978), *cert. denied,* 440 U.S. 918, 99 S.Ct. 1238, 59 L.Ed.2d 468 (1979); *United States v. Semak,* 536 F.2d 1142, 1144–45 (6th Cir.1976). As we stated in *Semak,* "the recurrence of similar acts incrementally reduces the possibility that the given instance ... is the result of inadvertence, mistake, or other innocent event." *See id.* at 1145. The evidence in question here was clearly probative of the absence of mistake and thus came within one of the exceptions stated in Rule 404(b).

■ Even if evidence of a prior act is probative of one of the issues specified in Rule 404(b), it should be excluded if its prejudicial impact outweighs its probative value. *See* Fed.R.Evid. 403; *United States v. Davis,* 707 F.2d 880, 884 (6th Cir.1983); *United States v. Vincent,* 681 F.2d 462, 465 (6th Cir.1982). A district judge's balancing of prejudicial impact and probative value under Rule 403 is reviewable for abuse of discretion. *Davis,* 707 F.2d at 884; *Vincent,* 681 F.2d at 465.

We find no abuse of discretion in admitting the evidence in question in this case. The evidence had a high probative value because Holloway's knowledge was a crucial issue in the case. The prejudicial impact of the evidence was blunted by a properly worded limiting instruction.[5] *See Da-*

3. Rule 404(b) provides:
   Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

4. Rule 403 provides:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

5. The district court cautioned the jury as follows:
   You have heard evidence tending to show that Defendant Quema Holloway was guilty of im-

proper conduct for which she is not on trial. I'm speaking of the testimony to the effect of any other checks that were based upon the filing of fraudulent tax returns.
   You are the sole judges of whether to believe any such testimony. However, should you believe such evidence, you are ... cautioned that it is before you for a limited purpose, that is for the purpose of determining if it tends to show her knowledge that the checks involved in this case were fraudulent, or her plan to defraud the government.
   This evidence must not be considered by you for any other purpose. You must not, for instance, regard the evidence as showing that the Defendant is a person of bad character, or that she had disposition to commit crimes. You must not convict a defendant because you believe that she's guilty of other improper conduct.

*vis,* 707 F.2d at 884 ("Though the chance of prejudice is always present in a 404(b) situation, the district judge greatly reduced this problem by giving the jury a limiting instruction ...."). Moreover, exclusion of evidence under Rule 403 is necessary "only where the probative value of the relevant evidence is *substantially* outweighed by the danger of unfair prejudice." *United States v. Hans,* 684 F.2d 343, 346 (6th Cir.1982). In reviewing a district court's ruling on a Rule 403 objection, "we must look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Brady,* 595 F.2d 359, 361 (6th Cir.), *cert. denied,* 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84 (1979). Viewing the prior acts testimony in this light, we cannot conclude that its potential for prejudice substantially outweighs its probative value.

Holloway also asserts that a ruling by the district court on the admissibility of evidence of her association with Ku Klux Klan requires reversal. This issue arises in a somewhat unusual procedural context.

Kathleen Felde, Quema Holloway's former housekeeper, testified for the government. During the course of the trial, defense counsel learned that Felde "might be inclined to testify" about Holloway's relationship with the Ku Klux Klan. He therefore made a motion *in limine* to exclude any evidence concerning the Klan as irrelevant and prejudicial. The district court ruled that the government's witnesses could not testify during the government's case-in-chief about Holloway's association with the Klan. The court also ruled, however, that if Holloway put her character in issue he would reconsider his ruling. He expressly reserved ruling on whether the Klan evidence could be used to impeach

Holloway's good character if that issue were later injected into the case.

During the presentation of Holloway's defense, Ray Christiansen was called as a character witness for Holloway. Christiansen testified that Holloway had a reputation in the community for honesty and fair dealing. In developing a foundation for Christiansen's testimony, defense counsel elicited from Christiansen that he knew Holloway because they met to discuss "religious matters, and our particular interpretations of various parts of the Scripture." Christiansen also testified that he was a county commissioner and knew Holloway as a constituent.

Before proceeding with cross-examination, the government moved the court to allow it to cross-examine Christiansen on his and Holloway's affiliation with the Ku Klux Klan. The government's theory was that since Christiansen testified that his friendship with Holloway was based on shared religious views and his position as a county commissioner, the government should be able to show that the friendship was also based on "other groups and organizations," and in particular the Ku Klux Klan. The government also argued that Holloway's character as a religious person had been put in issue by virtue of Christiansen's testimony. The government argued that it should be able to rebut this evidence by asking Christiansen about his and Holloway's association with the Ku Klux Klan.

The district court ruled that the government could not cross-examine Christiansen on his Holloway's association with the Ku Klux Klan. The court also ruled, however, that any future testimony on Holloway's religious beliefs would put her character trait for religiousness into issue and would open the door for testimony regarding the Klan. Specifically, the court ruled that "we will keep the witness around to further pursue it, in the event there is any more of the same." [6] The government ad-

---

**6.** The government argues that the district court never ruled that the Ku Klux Klan evidence would be admissible. We admit that the district court's language could be interpreted to mean that it was reserving any ruling on whether future testimony as to Holloway's religious beliefs would open the door for the Klan testimony, but the district court's later ruling on a

post-trial motion makes it clear that his ruling was that the Ku Klux Klan evidence would be admitted if future character witnesses testified as to Holloway's religious beliefs. During a hearing on post-trial motions the district court stated that he had ruled,

that we would hear evidence of a affiliation with the Ku Klux Klan, and or such other

hered to the trial court's ruling and made no mention of the Ku Klux Klan during its brief cross-examination of Christiansen.

Holloway argues that this ruling was erroneous and that its effect was to prevent her from introducing other character evidence. She argues that two distinct character traits were a part of her defense: first, she introduced evidence of her character for honesty; second, she attempted to introduce evidence of her traits of religiousness and charity to show that "pursuant to her Christian precepts," she communicated with prisoners and cashed checks for them "out of a sense of charity," not knowing the checks to have been fraudulently obtained. The effect of the assertedly erroneous district court ruling, she argues, was to proclude her from presenting character evidence of the trait of religiousness and charity. The government responds that the ruling was not erroneous and that, even if it was, it is not reviewable by this court because evidence of Holloway's relationship with the Ku Klux Klan was never introduced and because Holloway did not call any further character witnesses to testify as to her religious beliefs.

■ We need not decide whether the district court's ruling was erroneous or whether this is a reviewable issue [7] because if any error occurred it was harmless. Holloway had three character witnesses, Christiansen, her brother Kenneth Marlette and a minister, Kenard Schaibley. These witnesses were to present two different character traits, honesty and religious charity. Christiansen, as has been noted above, was

able to testify as to both Holloway's honesty and her religious nature. Holloway's brother was also called after the district court's last ruling on the Ku Klux Klan evidence. He testified not only that Holloway was honest but also that she was generous: he stated that Holloway "would give you the shirt right off from her back." Thus, two of Holloway's three character witnesses were able to testify as to the two character traits in issue without being impeached by the Ku Klux Klan testimony. Although Holloway did not call Schaibley to testify as a character witness, even under her theory that the district court's assertedly erroneous ruling on the Ku Klux Klan evidence amounted to a coerced exclusion of character evidence, nothing prevented him from testifying as to Holloway's character for honesty. Thus, two of Holloway's three character witnesses fully testified and the third could have testified about her character for honesty. Since the testimony of Schaibley as to Holloway's character trait of religious charity would have been cumulative, any error which may have occurred was harmless. Thus, this case is governed by the rule that "errors in the exclusion of evidence may be cured by the admission of other evidence of substantially the same nature." *Warden v. United States*, 391 F.2d 747, 750 (10th Cir.1968). *See also Vines v. Muncy*, 553 F.2d 342, 349 (4th Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 163, 54 L.Ed.2d 120 (1977); *Osborne v. United States*, 542 F.2d 1015, 1018 (8th Cir.1976); *Harper v. United States*, 143 F.2d 795, 806 (8th Cir.1944). *Cf. United*

evidence of claims or assertions as might be made by other witnesses, and the Court sought to make that clear at the outset, never to preclude the Plaintiff or Defendant in this case from discussing her Christian principle or qualities of trait, of honesty and charity, but once introduced, of course, it would place before the factfinder, quite obviously under the rule, the opportunity to explore that further, as to how that works out.

The Court has never prevented ... any person from testifying either personally or through others, as to the character traits of honesty and charity. It's just that if we're going to do some, we're going to do it all.

Thus, our review of the record indicates that the district court did in fact rule that testimony

relating to Holloway's association with the Ku Klux Klan would be admissible if future testimony was presented which related to Holloway's religious beliefs.

7. For a closely analogous case, which indicates that the correctness of the district court's ruling may not be reviewable, see *United States v. Luce*, 713 F.2d 1236 (6th Cir.1983), *cert. granted*, —— U.S. ——, 104 S.Ct. 1677, 80 L.Ed.2d 152 (1984). *See also United States v. LeBlanc*, 612 F.2d 1012 (6th Cir.), *cert. denied*, 449 U.S. 849, 101 S.Ct. 137, 66 L.Ed.2d 60 (1980). *Contra United States v. Lewis*, 482 F.2d 632 (D.C.Cir. 1973).

*States v. Haynes*, 554 F.2d 231, 234 (5th Cir.1977) (per curiam) (district court has power to limit number of character witnesses); *United States v. Squella-Avendano*, 478 F.2d 433, 438 (5th Cir.1973) (same); 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[05] (1982) (same). *Compare United States v. Lewis*, 482 F.2d 632, 644–47 (D.C.Cir.1973) (in similar situation, court found harmless error due to overwhelming evidence of guilt). Comparing the amount of testimony which Holloway claims she was prevented from presenting with the amount of testimony she had planned to present, "[w]e can not conclude that 'it is more probable than not that the [exclusion] affected the verdict'," and we thus find that any error which may have occurred was harmless. *See United States v. Smith*, 736 F.2d 1103 at 1107 (6th Cir. 1984) (quoting *United States v. Rasheed*, 663 F.2d 843, 850 (9th Cir.1981), *cert. denied*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982)).

### III.

Holloway raises two other contentions which are easily disposed of.

■ Holloway asserts that the district court erroneously instructed the jury on the knowledge element of 18 U.S.C. § 287. Specifically, Holloway objects to the following portion of the jury charge:

> The fact of knowledge, however, may be established by direct or circumstantial evidence, just as any other fact in the case.
>
> The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes or her eyes to what would otherwise have been obvious to him or her.
>
> A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant's knowledge of a fact may be inferred from wilfull blindness to the existence of the fact.

It is entirely up to you to—as to whether you find any deliberate closing of the eyes, and the inferences to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of wilfullness or knowledge.

We upheld this instruction, however, in the appeal of Holloway's co-defendant. *See Holloway*, 731 F.2d at 380–81. There was no error in this instruction.

Holloway also argues that the government failed to disclose exculpatory material, in violation of the principles announced in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and failed to disclose the substance of a statement made by Holloway to Jeffrey DeNeen of the Internal Revenue Service in violation of Federal Rule of Criminal Procedure 16(a)(1)(A).

During the investigation of this tax fraud scheme, DeNeen and agent William Shelley interviewed Holloway. Shelley wrote a report which stated that "HOLLOWAY related that she has no knowledge of either CONNOR'S or SCARBOURGH'S [sic] whereabouts." A copy of this report was provided to Holloway following a general request for exculpatory materials. DeNeen, but not Shelley, testified at trial. According to DeNeen's testimony, Holloway stated during this interview that "[s]he didn't know of his [Connor's] whereabouts, but that he had gone south, or was working in the south." Shelley's report was admitted into evidence by Holloway's counsel during the cross-examination of DeNeen.

■ Holloway first argues that DeNeen and Shelley had inconsistent recollections of their interview with Holloway and that this inconsistency was "exculpatory" and thus subject to disclosure under *Brady*. This contention lacks merit. Even if Shelley's and DeNeen's accounts of the conversation with Holloway were "inconsistent," a matter of some doubt, and even if this inconsistency was "material" under *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976),[8] no *Bra-*

---

8. *Agurs* identified "three quite different situations" in which *Brady* issues arise. The first situation involves the knowing use of perjured

testimony by the government. *See Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397. The present case

*dy* violation occurred in this case because Holloway became aware of the assertedly exculpatory evidence during the prosecutor's opening statement and because De-Neen's account of the interview with Holloway was fully explored during his direct testimony. The principles announced in *Brady* do not apply, in general, to tardy disclosures of exculpatory information but to complete failures to disclose. *See Agurs*, 427 U.S. at 103, 96 S.Ct. at 2397 (*Brady* problems involve a "discovery, *after trial*, of information which had been known to the prosecution but unknown to the defense") (emphasis added); *United States v. Toney*, 599 F.2d 787, 789 (6th Cir.1979) (dicta). If previously undisclosed evidence is disclosed during trial, no *Brady* violation occurs unless the defendant has been prejudiced by the delay in disclosure. *See United States v. Enright*, 579 F.2d 980, 989–90 (6th Cir.1978). *Accord. United States v. Xheka*, 704 F.2d 974, 981–82 (7th Cir.), *cert. denied,* ─── U.S. ───, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983); *United States v. McPartlin*, 595 F.2d 1321, 1346 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979) ("[t]here is nothing in *Brady* or *Agurs* to require that such disclosures be made before trial"). In the present case, as in *Enright*, the disclosure was made "in time for full and adequate correction." *Enright*, 579 F.2d at 989. Counsel for Holloway introduced Shelley's report into evidence and used it to cross-examine DeNeen. Although Holloway contends that because of the timing of the disclosure she was unable to subpoena Shelley in order to impeach DeNeen's testimony, counsel for Holloway made no request for such a subpoena or for a continuance. In such a circumstance, we conclude that the timing of the disclosure did not prejudice Holloway.

■ Holloway also argues that the government failed to provide the "substance of any oral statement" made by Holloway as required by Federal Rule of Criminal Procedure 16(a)(1)(A). This argument overlooks the release of Shelley's report to Holloway. This disclosure did provide the "substance" of Holloway's oral statement. This disclosure discharged the government's duty under Rule 16.

## IV.

■ The last issue presented by Holloway relates to the propriety of the sentence imposed by the district court. The district court sentenced Holloway on June 30, 1983 to the following sentence:

> The defendant is hereby committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of FIVE YEARS and on condition that the defendant be confined in an institution for SIX MONTHS. The balance of the sentence of imprisonment is suspended and defendant is placed on Probation for FOUR YEARS to commence upon the defendant's release from confinement. Sentences are the same as to both counts and are to run concurrently.
>
> Defendant is not to communicate by mail with anyone in prison during the term of her 5 year sentence. While incarcerated, defendant is to communicate by mail only with her relatives, legal counsel and other recognized counselors.

Holloway now argues that these restrictions on communications violate her rights under the first amendment of the United States Constitution.

At the outset, we are faced with a procedural problem. The sentence was imposed

---

does not present a problem of this type since Holloway testified that she did in fact tell De-Neen and Shelley that Connors was somewhere in the south. The second situation identified by *Agurs* involves noncompliance with a specific request for information. *See id.* at 104, 96 S.Ct. at 2397–98. This is not the situation here because Holloway made only a general request for information. The third situation involves the failure to disclose exculpatory information

when the defense makes only a general request or no request at all. *See id.* at 107, 96 S.Ct. at 2399. The present case presents this type of issue. In such cases, the failure to disclose warrants reversal only if the "omitted evidence creates a reasonable doubt that did not otherwise exist." *Id.* at 112, 96 S.Ct. at 2401–02. Were we to decide the question of materiality, this last standard would apply.

on June 30, 1983 and a notice of appeal was filed on July 8, 1983. In her brief, Holloway advised this court that she had filed a motion on July 29, 1983 to reduce or correct the sentence under Federal Rule of Criminal Procedure 35, but that the district court had not yet ruled on this motion. During oral argument, counsel for Holloway informed us that the district court had in the interim granted the motion in part, removing the restrictions which prevented Holloway from communicating by mail with anyone other than her "relative, legal counsel and other recognized counselors."

Although the parties did not raise the issue, this court is constrained to hold that the district court lacked jurisdiction to enter its order modifying the sentence.[9] Both the motion to correct or reduce the sentence and the district court's action on that motion came after the notice of appeal was filed. It is well settled that the filing of the notice of appeal with the district court clerk [10] deprives the district court of jurisdiction to act in matters involving the merits of the appeal. As the Supreme Court has recently stated, it is,

> generally understood that a federal district court and a federal court of appeals should not attempt to assert jurisdiction over a case simultaneously. The filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.

*Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982) (per curiam). The only recognized exceptions to this rule allow a district court to enter remedial orders not affecting the merits of the appeal, such as orders granting bail to a successful habeas petitioner, *see Jago v. United States District Court*, 570 F.2d 618 (6th Cir.1978), and to proceed with a case when the notice of appeal is from a patently non-appealable order, *see Cochran v. Birkel*, 651 F.2d 1219 (6th Cir.1981), *cert. denied*, 454 U.S. 1152, 102 S.Ct. 1020, 71 L.Ed.2d 307 (1982).

The district court's order vacating part of the sentence upon the motion under Rule 35 cannot be characterized as not affecting the merits of this appeal; nor can it be seriously contended that Holloway's conviction and sentence are not appealable. It is thus clear that the district court lacked jurisdiction to consider or act upon the Rule 35 motion after the notice of appeal had been filed. *See, e.g., Berman v. United States*, 302 U.S. 211, 214, 58 S.Ct. 164, 166, 82 L.Ed. 204 (1937); *United States v. Johns*, 638 F.2d 222, 224 (10th Cir.1981); *United States v. Mack*, 466 F.2d 333, 339–40 (D.C.Cir.), *cert. denied*, 409 U.S. 952, 93 S.Ct. 297, 34 L.Ed.2d 223 (1972); *United States v. Burns*, 446 F.2d 896, 897 (9th Cir.1971); *United States v. Ramey*, 559 F.Supp. 60, 68 (E.D.Tenn.1981).[11] In the present case, the district court's order is "null and void since that court was without jurisdiction ... after the appeal had been taken." *See Keohane v. Swarco, Inc.*, 320 F.2d 429, 432 (6th Cir.1963). Accordingly, we must review the sentence as originally imposed.

█ It cannot be doubted that first amendment concerns are implicated when restrictions are imposed upon an inmate's correspondence. *See Procunier v. Mar-*

---

**9.** Since this is a problem of jurisdiction, we must address it even though the parties have not.

**10.** The filing of the notice of appeal with the district court, and not the docketing of the appeal in the court of appeals, is the event significant for jurisdictional purposes. *See* Fed.R. App.Pro. 3(a); 16 C. Wright, A. Miller, E. Cooper & E. Gressman, *Federal Practice and Procedure*, § 3949, at 358 (1977).

**11.** The statement in Rule 35 that a court may correct an illegal sentence "at any time" was merely "a codification of existing law and was intended to remove any doubt ... as to the jurisdiction of a District Court to correct an illegal sentence after the expiration of the term at which it was entered." *Heflin v. United States*, 358 U.S. 415, 422, 79 S.Ct. 451, 455, 3 L.Ed.2d 407 (1959) (Stewart, J., concurring). *See also Duggins v. United States*, 240 F.2d 479, 483 (6th Cir.1957). Rule 35 therefore does not expand a trial court's power to act during the pendency of an appeal. *Mack*, 466 F.2d at 340.

*tinez,* 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). Several courts have had occasion to consider conditions of probation which affect constitutional rights. *See, e.g., United States v. Stine,* 675 F.2d 69 (3d Cir.), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); *United States v. Lawson,* 670 F.2d 923 (10th Cir. 1982); *United States v. Lowe,* 654 F.2d 562 (9th Cir.1981); *United States v. Smith,* 618 F.2d 280 (5th Cir.), *cert. denied,* 449 U.S. 868, 101 S.Ct. 203, 66 L.Ed.2d 87 (1980); *United States v. Consuelo-Gonzalez,* 521 F.2d 259 (9th Cir.1975) (en banc). These cases are in general agreement that the test to be used in such cases inquires whether the condition is reasonably related to the dual goals of probation, the rehabilitation of the defendant and the protection of the public. *See Stine,* 675 F.2d at 71; *Lawson,* 670 F.2d at 929; *Lowe,* 654 F.2d at 567; *Smith,* 618 F.2d at 282.

Under this standard, we have no difficulty in upholding the condition on Holloway's sentence which forbids her from communicating with prisoners. Conditioning Holloway's probation on not writing letters to inmates promotes Holloway's rehabilitation and the protection of the public. The record in this case clearly shows that Holloway became involved in this scheme only by virtue of her extended correspondence with inmates. Moreover, the criminal conduct of which Holloway stands convicted involved the use of the mails. In such circumstances, the condition imposed by the district court is likely to aid Holloway's rehabilitation by denying her access to the cause and instrumentality of her crime and also protects the public from future tax frauds.

As noted above, the district court also ordered that Holloway could "communicate by mail only with her relatives, legal counsel and other recognized counselors" during the period of her incarceration. This second restriction is much broader than the first and consequently is more problematic. On its face this restriction would forbid

Holloway from writing letters to a wide range of persons who had nothing to do with her criminal conduct. The class of persons excluded from her mailing privileges by the sentence would include, for example, holders of public office. Also excluded from correspondence by mail would be lifelong friends and "counselors" of various types who for one reason or another are not "recognized." The limitation on Holloway's ability to communicate with friends, informal advisors and holders of public office is sufficiently broad to affect values and principles which are undoubtedly at the core of the first amendment. We agree with the Ninth Circuit that,

> [w]hile it must be recognized that probationers, like parolees and prisoners, properly are subject to limitations from which ordinary persons are free, it is also true that these limitations in the aggregate must serve the ends of probation. Conditions that unquestionably restrict otherwise inviolable constitutional rights may properly be subject to special scrutiny to determine whether the limitation does in fact serve the dual objectives of rehabilitation and public safety.

*Consuelo-Gonzalez,* 521 F.2d at 265 (footnote omitted). The present restriction on mailing simply is not carefully drawn to "serve the dual objectives of rehabilitation and public safety." Rather, it imposes a restriction on Holloway which, because of its breadth, does not bear a logical relationship to the criminal conduct in which Holloway has engaged. The restriction is not, therefore, reasonably related to achieving rehabilitation and to protecting the public.[12] *Cf. Lawson,* 670 F.2d at 929–30; *Smith,* 618 F.2d at 282; *Porth v. Templar,* 453 F.2d 330, 334 (10th Cir.1971).

## V.

The conviction of Quema Holloway is AFFIRMED. That portion of her sentence which limits her communications by mail to only relatives, legal counsel and other rec-

---

**12.** We acknowledge, of course, that the district court deferred to these considerations in its

untimely modification of the sentence.

ognized counselors is VACATED. The remainder of her sentence is AFFIRMED.